UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ANDRE KING-HARDIMAN,

                         Petitioner,

    v.

NETHANJAH BREITENBACH,[1] et al.,

                    Respondents.

Case No. 3:19-cv-00484-ART-CSD

ORDER

Petitioner Andre King-Hardiman, a state prisoner who pleaded guilty to murder, home invasion, burglary, and robbery and was sentenced to, *inter alia*, life imprisonment without the possibility of parole, filed a first-amended petition for writ of habeas corpus under 28 U.S.C. § 2254. (ECF Nos. 19, 20-14.) This matter is before this court for adjudication of the merits of the remaining grounds[2] in the first-amended petition, which allege that (1) his plea was invalid and (2) his counsel failed to adequately inform him about the direct consequences of his plea. (ECF No. 19.) For the reasons discussed below, this court grants the first-amended petition.

## I.  BACKGROUND

### A.  Factual background[3]

J.K., who was six years old at the time of the grand jury proceedings in this

---

[1]The state corrections department's inmate locator page states that King-Hardiman is incarcerated at Lovelock Correctional Center. Nethanjah Breitenbach is the current warden for that facility. At the end of this order, this court directs the clerk to substitute Nethanjah Breitenbach as a respondent for Respondent Gittere. *See* Fed. R. Civ. P. 25(d).

[2]This court previously dismissed ground 2 as untimely. (ECF No. 56.)

[3]This court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the grand jury proceedings. This court's summary is merely a backdrop to its consideration of the issues presented in the first-amended petition.

case, testified that her father, King-Hardiman, rang the doorbell of her mother's house on April 10, 2008. (ECF No. 36-2 at 27, 33.) J.K.'s mother, Sabrina King (hereinafter "Sabrina"), opened the door and then quickly closed it. (*Id.* at 33.) King-Hardiman kicked the door open, and Sabrina ran down the hallway, eventually tripping and falling to the ground. (*Id.* at 33–34.) King-Hardiman choked Sabrina, dragged her into another room, and placed her on a couch. (*Id.* at 35–36.) According to Detective Martin Wildeman, during J.K.'s interview with police, she also "mentioned that part of the interaction [between her mother and father] occurred in her bedroom, that her mom in trying to get away had actually crawled under her bed attempting to hide from her father and that he had pulled her out." (*Id.* at 79, 81.) A.S., Sabrina's fourteen-year-old daughter and J.K.'s half-sister, testified that when she returned home from school on April 10, 2008, she found the front door of her house broken, Sabrina's jewelry box and cell phone broken, two televisions and a computer missing, and Sabrina's purse's contents spread on the kitchen counter. (*Id.* at 10, 12, 19, 22, 23.)

Detective Dean Raetz testified that the fire department received a report of "a fire in the inside [of] the Nevada Power substation . . . [and] discovered [there] was a body on fire." (*Id.* at 59–60.) Detective Raetz responded to the scene and determined that an accelerant had been poured on the body and "was trailed away from the body in order to set the fire a distance away." (*Id.* at 62.) The body was missing its hands, and the face had been mutilated.[4] (*Id.* at 63.) Dr. Jacqueline Benjamin, a medical examiner, performed an autopsy of the body, which was later determined to be Sabrina, and determined that Sabrina died as a result of strangulation, that the disfiguring injuries made to her face and the severance of her hands were done after her death, and that she was already dead at the time her body was lit on fire. (*Id.* at 47–48.)

---

[4]King-Hardiman testified during his state post-conviction proceedings that he cut Sabrina's jaw off with a hatchet. (ECF No. 43-16 at 14.)

1    Detective Teresa Kyger testified that a search of the residence that King-

2  Hardiman was staying at revealed "a white grocery bag wrapped around an ax

3  that was all covered in blood." (*Id.* at 54–55.) Two human hands were found inside

4  the bags. (*Id.* at 55.)

5    **B.    Procedural background**

6    King-Hardiman was indicted for murder, invasion of the home, burglary,

7  and robbery. (ECF No. 36-3.) For each count, King-Hardiman was charged with

8  committing the felony in violation of a domestic-violence protection order. (ECF

9  No. 36-14.) The prosecution filed a notice of intent to seek the death penalty.

10  (ECF No. 36-7.) On February 11, 2014, the day that the jury trial was scheduled

11  to begin, King-Hardiman and the prosecution reached a guilty plea agreement.

12  (ECF No. 20-4.) King-Hardiman agreed to plead guilty to the charges in return for

13  the prosecution withdrawing its notice of intent to seek the death penalty. (*Id.*)

14  King-Hardiman pleaded guilty, and the trial court accepted his plea. (*Id.* at 5, 15.)

15    On May 21, 2014, King-Hardiman filed *pro se* motions to withdraw his plea

16  and dismiss his counsel. (ECF Nos. 20-5, 20-6.) The state court denied King-

17  Hardiman's motions. (ECF No. 20-7.) On June 13, 2014, King-Hardiman's

18  counsel filed a motion to withdraw. (ECF No. 20-8.) The state court denied the

19  motion. (ECF No. 20-9.) On July 31, 2014, the state court entered a judgment of

20  conviction, sentencing King-Hardiman to life imprisonment without the

21  possibility of parole for murder, 48 to 120 months for home invasion, 48 to 120

22  months for burglary, and 72 to 180 months for robbery. (ECF No. 20-14.) All

23  sentences were ordered to run concurrently. (*Id.*)

24    King-Hardiman appealed. (ECF No. 42-9.) On September 15, 2015, the

25  Nevada Court of Appeals affirmed. (ECF No. 21-3.) On December 2, 2016, King-

26  Hardiman filed a state post-conviction habeas corpus petition. (ECF No. 21-6.)

27  The state district court denied the petition. (ECF No. 21-9.) King-Hardiman

28  appealed. (ECF No. 44-1.) On July 17, 2019, the Nevada Court of Appeals

affirmed. (ECF No. 21-13.)

King-Hardiman's *pro se* federal habeas corpus petition was received by this court on August 13, 2019. (ECF No. 1-1 at 1.) On January 9, 2020, the court dismissed the action because King-Hardiman had not paid the filing fee. (ECF No. 7.) King-Hardiman paid the filing fee and filed another *pro se* federal habeas corpus petition on February 3, 2020. (ECF Nos. 9, 10.) On February 14, 2020, the court reopened this action. (ECF No. 11.) The court appointed counsel to represent King-Hardiman, and King-Hardiman filed his instant counseled first-amended petition on May 20, 2020. (ECF No. 19.) Respondents moved to dismiss the first-amended petition on August 18, 2021. (ECF No. 35.) This court granted the motion, in part, dismissing ground 2 as untimely. (ECF No. 56.) Respondents answered the first-amended petition on February 14, 2023. (ECF No. 68.) King-Hardiman replied on August 4, 2023. (ECF No. 77.)

## II.   GOVERNING STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a

rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## III.   DISCUSSION

### A.   Ground 1—validity of guilty plea

In ground 1, King-Hardiman alleges that he entered a plea that was not voluntary, knowing, or intelligent in violation of his right to due process under

the Fifth and Fourteenth Amendments. (ECF No. 19 at 17.) King-Hardiman explains that (1) the state court failed to accurately advise him of the range of punishments allowable under his plea, and (2) he did not comprehend the nature of his guilty plea because no one adequately explained the elements and facts supporting the first-degree murder count to him. (ECF No. 77 at 6.)

### 1.   Background information

As noted previously, King-Hardiman's capital murder trial was scheduled to begin on February 11, 2014. (ECF No. 20-4.) Before the jury was called in, the parties notified the state court that they had come to a plea agreement resolving the case.[5] (*Id.* at 3.) King-Hardiman's counsel put the terms of the negotiation on the record: "in exchange for Mr. King entering a plea of guilty to the counts contained in the . . . Amended Superseding Indictment . . . , the State will withdraw its notice of intent to seek the death penalty." (*Id.*) The parties also "reserved the right to argue as to what the appropriate sentence would be within the confines of a first degree murder count as well as the enhancements." (*Id.*) The state court confirmed that (1) King-Hardiman reviewed the amended superseding indictment and (2) King-Hardiman's counsel answered any questions he had about the elements of the offenses in the amended superseding indictment. (*Id.* at 4–5.) King-Hardiman then entered guilty pleas to murder, invasion of the home, burglary, and robbery. (*Id.* at 5.)

Next, the state court started its canvass to determine whether King-Hardiman's guilty pleas were freely, voluntarily, and knowingly entered. (*Id.*) After King-Hardiman stated that no one had coerced him to plead guilty, the state court asked him whether any promises had been made other than the ones in the guilty plea agreement. (*Id.*) King-Hardiman answered, "I was under the impression I'd

---

[5]It appears that the plea offer was not made to King-Hardiman until the morning of February 11, 2014, and that it was the first plea offer made in this case. (*See* ECF No. 20-12 at 3.)

6

be facing 20 to 50 or 20 to life. That's why I signed the deal." (*Id.*) The following

colloquy then occurred:

| | |
|---|---|
| THE COURT: | Well, we're going to get there in a second 'cause I have to - - or we're going to [go] through what the penalty ranges are. |
| THE DEFENDANT: | And nothing more. |
| THE COURT: | Yes. The - - they've removed the death penalty pursuant to negotiations. They cannot and will not seek the death penalty. |
| THE DEFENDANT: | No life with and no life without. |
| THE COURT: | I don't know. Is that part of the negotiations? |
| [PROSECUTOR]: | No, Your Honor. |
| [DEFENSE COUNSEL]: | The State has reserved the right to argue - - |
| THE DEFENDANT: | Then I take my - - |
| [DEFENSE COUNSEL]: | - - for life without the possibility. |
| THE DEFENDANT: | Then I take it back. I'm not taking life. |
| [DEFENSE COUNSEL]: | Well, it's up to the Judge. |
| THE COURT: | Okay. It's up to you. This is your life. |
| THE DEFENDANT: | Uh-hum. |
| THE COURT: | Understand that the negotiations contemplate a withdrawal of the death penalty but the minimum range on first degree murder is 20 to 50, a definite term; a life - - 20 on the bottom, a life with the possibility of parole; or 20 on the bottom, life without the possibility of parole. Those are the range of punishments, but the death penalty is off the table. |
| THE DEFENDANT: | I don't deserve life at any point. |
| THE COURT: | Okay. I can't accept the plea. He's refusing to agree to the terms of it. We have a jury in the jury room. |
| [DEFENSE COUNSEL]: | Could we have a moment, Your Honor - - |
| THE COURT: | Absolutely. |
| [DEFENSE COUNSEL]: | - - with our client? Thank you. |
| THE COURT: | Okay. Mr. King, talk to your lawyers, because understand that there's no decisions made on the penalty. There's going to be - - the common practice in these situations is to have a penalty hearing and everybody presents evidence and a decision is made at that point. But you need to understand that those are the potential options and all of them would be on the |

> table. Talk to your lawyers. I'll step away. Frankly, prosecutors, why don't you give them a few a [sic] minutes, too; all right?

(*Id.* at 5–7.) A recess was taken from 9:14 a.m. to 9:31 a.m. (*Id.* at 7.)

After the recess, the state court explained that King-Hardiman "ha[d] to understand that no one can promise [him] an outcome here" and "[t]hat the range of punishments are three and they'll all be on the table equally as a function of [the] sentencing hearing." (*Id.*) The state court then explained:

> So when we left off, you were saying: Judge, I don't think this is a life case or I should have a life sentence. But you should understand that that's the potential. The range of punishment on a murder, first degree murder, is 20 to 50 years, it's 20 to life with the possibility of parole or it's 20 to life without the possibility of parole and no one can promise you any outcome. This is obviously a non-probational offense on the murder. So the minimum you're looking at is 20 on the bottom and a potential life without.

(*Id.* at 7–8.) The state court then asked if King-Hardiman still wanted the state court to accept his guilty plea, and King-Hardman said yes. (*Id.* at 8.) King-Hardiman then answered in the affirmative when asked the following questions: whether he signed the plea agreement; whether he understood the plea agreement; whether his counsel answered his questions about the plea agreement; and whether he understood that the next step would be sentencing in which the state court would "make a decision whether it's a fixed term, 20 to 50, whether it's a life with or it's a life without" sentence. (*Id.* at 8–10.) After going through the other charges and sentencing ranges, the state court found that King-Hardiman's pleas were entered into freely and voluntarily and that King-Hardiman "appear[s] to understand the . . . nature of the offenses . . . [and] the consequences of the pleas." (*Id.* at 15.)

King-Hardiman's written guilty plea agreement was filed in open court during the change of plea. (ECF No. 20-3.) The written guilty plea agreement provided that "[t]he State agrees to retain the right to argue at sentenc[ing], including to argue for life without the possibility of parole" on the murder count,

but "the State will not seek the death penalty." (*Id.* at 2.) The guilty plea agreement also provided the following possible sentences for the murder charge: (1) "life with the possibility of parole with parole eligibility beginning at twenty (20) years," (2) a "definite term of fifty (50) years with parole eligibility beginning at twenty years (20) years," or (3) "life without the possibility of parole." (*Id.* at 3.) Within the plea agreement, King-Hardiman agreed that he had "not been promised or guaranteed any particular sentence by anyone" and that he knew that his "sentence [was] to be determined by the Court within the limits prescribed by statute." (*Id.* at 5.)

Three months later, on May 21, 2014, King-Hardiman filed a *pro se* motion to withdraw his guilty plea. (ECF No. 20-5.) In his motion, King-Hardiman alleged that his counsel coerced him to plead guilty by explaining that the state court judge was biased and would not give him a fair trial. (*Id.* at 3.) The state court denied the motion without holding an evidentiary hearing. (ECF No. 20-7 at 9.)

## 2.     State court determination

In affirming King-Hardiman's judgment of conviction, the Nevada Court of Appeals held:

> Appellant Andre Hardiman claims the district court abused its discretion by denying his motion to withdraw his guilty plea without a full review of the record and an evidentiary hearing.
>
> A defendant may move to withdraw a guilty plea before sentencing, NRS 176.165, and the district court may, in its discretion, grant such a motion for any substantial reason that is "fair and just," *State v. Second Judicial Dist. Court (Bernardelli),* 85 Nev. 381, 385, 455 P.2d 923, 926 (1969). To this end, the Nevada Supreme Court has recently ruled that "the district court must consider the totality of the circumstances to determine whether permitting withdrawal of a guilty plea before sentencing would be fair and just," and it has disavowed the standard previously announced in *Crawford v. State*, 117 Nev. 718, 30 P.3d 1123 (2001), which focused exclusively on whether the plea was knowing, voluntarily, and intelligently made. *Stevenson v. State,* 131 Nev. __, __, __ P.3d __, __ (Adv. Op. No. 61, August 13, 2015 at 8). In making its determination, the district court is required to conduct an evidentiary hearing if a defendant raises claims that are not belied by the record and would, if true, entitle him to relief. *Cf. Hargrove v.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*State,* 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984).

Here, Hardiman filed a pro se motion to withdraw his guilty plea, which alleged that defense counsel coerced him into pleading guilty to first-degree murder. The district court considered the parties' pleadings, the documents on file, and a video recording of the plea canvass before making the following findings: Hardiman acknowledged that he carefully read the written plea agreement, defense counsel answered his questions about the agreement, and he signed the agreement voluntarily and did not act under duress or coercion. Judge Barker thoroughly canvassed Hardiman regarding his plea. Hardiman orally indicated he was not forced or coerced into entering the plea. After defense counsel cleared-up some confusion about the sentencing possibilities, Hardiman stated that he wished to proceed with the plea canvass. Hardiman was actively engaged during the plea canvass and asked numerous questions. Hardiman's subsequent allegations of coercion are belied by the record and no grounds exist for conducting an evidentiary hearing. And even if the statements he attributed to defense counsel were made, they did not constitute coercion.

The record supports the district court's findings and the findings support our conclusion that Hardiman failed to present a fair and just reason for withdrawing his guilty plea. *See generally Gardner v. State,* 91 Nev. 443, 446, 537 P.2d 469, 471 (1975) (defendant bears the burden of proving he in fact was coerced). Accordingly, the district court did not abuse its discretion in this regard.

(ECF No. 21-3 at 3–5.)

### 3.   De novo review

First, King-Hardiman argues that ground 1 should be reviewed de novo because (1) the state court only adjudicated his claim that the state court erroneously denied his motion to withdraw his guilty plea before sentencing but did not address his separate claim that his plea was not knowing, intelligent, and voluntary, and (2) rather than analyzing whether his plea was knowing, voluntary, and intelligent based on the totality of the circumstances, the Nevada Court of Appeals only considered whether he was coerced into pleading guilty. (ECF No. 77 at 12.) The Nevada Supreme Court explained in *Stevenson v. State* that in determining whether to permit withdrawal of a guilty plea, the state court must not "exclusive[ly] focus on the validity of the plea" but "must consider the

totality of the circumstances to determine whether permitting withdrawal of a guilty plea before sentencing would be fair and just." 354 P.3d 1277, 1281 (Nev. 2015). Because the validity of a plea—King-Hardiman's instant constitutional claim—is subsumed within the "fair-and-just" analysis used to determine whether a guilty plea should be permitted to be withdrawn, it is implicit that the Nevada Court of Appeals adjudicated the validity of King-Hardiman's plea on the merits in determining that the state court did not abuse its discretion in denying the motion to withdraw the guilty plea. *Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Second, King-Hardiman argues that the Nevada Court of Appeals' finding that he was thoroughly canvassed is belied by the record. (ECF No. 77 at 13–14.) As will be discussed further below, the state court's canvass distorted and created confusion regarding the possible sentences King-Hardiman faced for a first-degree murder conviction. Given this blunder, the court finds that the Nevada Court of Appeals' finding that the state court "thoroughly canvassed Hardiman regarding his plea" was based on an unreasonable determination of the facts. As such, ground 1 will be reviewed de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires").

### 4.    Standard for a valid guilty plea

The federal constitutional guarantee of due process requires that a guilty plea be knowing, intelligent, and voluntary. *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). "The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S.

11

52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). For a plea to be knowing, intelligent and voluntary, the defendant must be advised of the direct consequences of the plea. *Brady v. United States*, 397 U.S. 742, 755 (1970). A direct consequence has "a definite, immediate and largely automatic effect on the range of the defendant's punishment[.]" *Torrey v. Estelle*, 842 F.2d 234, 236 (9th Cir. 1988). "Before a court may accept a defendant's guilty plea, the defendant must be advised of the 'range of allowable punishment' that will result from his plea." *Id.* at 235. The validity of a "plea can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749.

### 5.   Analysis

A person convicted of first-degree murder in Nevada faces the following sentencing possibilities under Nev. Rev. Stat. § 200.030(4): (a) by death, or (b) by imprisonment (1) for life without the possibility of parole, (2) for life with the possibility of parole, with parole eligibility beginning after 20 years, or (3) for a definite term of 20 to 50 years. The written plea agreement accurately reflected these sentencing possibilities. (*See* ECF No. 20-3 at 3.) However, importantly, during the plea canvass, the state court clumsily and imprecisely relayed the first imprisonment option on two separate occasions. During King-Hardiman's plea canvass, the state court stated the first imprisonment option—life without the possibility of parole—as follows: (1) "20 on the bottom, life without the possibility of parole," and (2) "it's 20 to life without the possibility of parole." (ECF No. 20-4 at 6, 8.) Because life without the possibility of parole means exactly that—the impossibility of parole at any point in time—the state court's inclusion of 20 years into its explanation of life without the possibility of parole is nonsensical, confusing, and troubling.[6] Indeed, due to the similarities with which the state

---

[6]The state court also said that "the minimum [King-Hardiman was] looking at is

court described life with the possibility of parole and life without the possibility of parole—*i.e.*, discussing parole eligibility after the 20-year imprisonment mark for both life imprisonment possibilities—it makes sense that King-Hardiman would have been confused about whether he faced the possibility of spending the rest of his life in prison. This issue is compounded by the fact that King-Hardiman was clearly opposed to accepting a plea agreement containing a life without the possibility of parole possible sentence, adamantly telling the state court on the record during his canvass that "I'm not taking life." (ECF No. 20-4 at 6.)

This court acknowledges the other circumstances surrounding King-Hardiman's plea, including, *inter alia*: King-Hardiman admitted that he read and signed the written guilty plea agreement, the written guilty plea agreement accurately outlined the first imprisonment option, King-Hardiman spoke with his trial counsel for approximately 17 minutes during a break in the change of plea hearing for them to allegedly discuss the sentencing options, and the state court made findings on the record that King-Hardiman's plea was freely, voluntarily, and intelligently made.[7] Although these circumstances are certainly relevant in terms of assessing the validity of King-Hardiman's guilty plea, when considered in conjunction with the material circumstances of the state court's disconcerting statements at the plea canvass and King-Hardiman's statements on the record at the plea canvass that he refused to plead guilty if he faced the possibility of life without the possibility of parole, this court is persuaded that King-Hardiman did not have sufficient awareness of the likely consequences of his plea. Accordingly,

_____

20 on the bottom and a potential life without." (ECF No. 20-4 at 8.) Although this could be construed as correctly relaying the overall range of possible penalties King-Hardiman faced, it is troubling that the state court did not include the word "maximum" as well, as this would have highlighted that the life without the possibility of parole possible penalty was not tied to the 20 year "bottom."

[7]Regarding this last point, this court notes that the state court's statement regarding the intelligent nature of King-Hardiman's plea was less than convincing, finding only that King-Hardiman "*does appear to* understand the . . . the consequences of the pleas." (ECF No. 20-4 at 15 (emphasis added).)

13

based on the record and considering the totality of the circumstances surrounding King-Hardiman's plea, King-Hardiman demonstrates that his guilty plea was not knowing, intelligent, and voluntary. *Boykin*, 395 U.S. at 242.[8] King-Hardiman is entitled to federal habeas relief for ground 1.

**B.      Ground 3—effective assistance of counsel regarding guilty plea**

In ground 3, King-Hardiman alleges that his counsel failed to adequately advise him about the direct consequences of his plea, denying him the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments. (ECF No. 19 at 21.) Encompassed within this ground are the following failures by King-Hardiman's counsel: failing to correct the state court's inaccurate statements during the plea canvass, failing to ask for a continuance—not just a recess—in the proceedings to allow more time to discuss King-Hardiman's plea with him, and allowing King-Hardiman to plead guilty when he was adamantly opposed to doing so when it would mean he was exposed to a life without the possibility of parole sentence. (ECF No. 77 at 17–19.)

**1.      Background information**

On March 15, 2018, during an evidentiary hearing on his state post-conviction petition, King-Hardiman testified, *inter alia*, that (1) he only had "about 30 to 45 minutes" to review the written guilty plea agreement before entering his guilty plea, (2) he agreed to enter into the guilty plea agreement because he "got overwhelmed with emotion" and did not want his daughter to have to testify and "relive everything," (3) "in [his] mind [he believed he] committed manslaughter" so he "didn't deserve life," (4) although he was only presented with the plea offer the first morning of trial, he had discussed the possible sentences he faced under

---

[8]Because the court finds that King-Hardiman demonstrates that his guilty plea was not knowing, intelligent, and voluntary because he did not have sufficient awareness of the likely consequences of his plea, the court does not reach King-Hardiman's alternate argument that no one adequately explained the elements and facts supporting the first-degree murder count to him.

Nevada law for a murder conviction, including the possibility of life imprisonment without the possibility of parole, with his trial counsel in the years proceeding his guilty plea, and (5) regardless of what the written plea agreement said and regardless of his understanding of the sentencing possibilities under Nevada law, he believed that life without the possibility of parole was no longer a sentencing option because the state court judge is "the one that calls the big shots" and mistakenly said "20 to life without the possibility of parole," which he believed meant he would serve 20 years in prison and then be released without any parole. (ECF No. 43-16 at 6, 7, 9, 16, 22.)

### 2.   Standard for an effective assistance of counsel claim

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires the petitioner to

demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012) ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice.").

### 2.   State court determination

In affirming the denial of King-Hardiman's state post-conviction petition, the Nevada Court of Appeals held:

> King argues the district court erred by denying his claim that counsel was ineffective for failing to adequately inform him about the consequences of his plea. Specifically, he claimed he did not see his plea agreement until moments before he signed it, he was rushed and did not have adequate time to review it and understand it; and he believed he could receive a sentence of "20 years to life without the possibility of parole" which meant a flat sentence of 20 years in prison. Therefore, he claimed, based on his counsel's ineffectiveness, his plea was not knowingly, voluntarily, and intelligently entered.
>
> To prove ineffective assistance of counsel sufficient to invalidate a judgment of conviction based on a guilty plea, a petitioner must demonstrate his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability, but for counsel's errors, petitioner would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985); *Kirksey v. State*, 112 Nev. 980, 988, 923 P.2d 1102, 1107 (1996). Both components of the inquiry must be shown. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). We give deference to the court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).
>
> A guilty plea is presumptively valid, and a petitioner carries the burden of establishing that the plea was not entered knowingly and intelligently. *Hubbard v. State*, 110 Nev. 671, 675, 877 P.2d 519, 521 (1994). Further, this court will not reserve a district court's determination concerning the validity of a plea absent a clear abuse of discretion. *Id.* at 675, 877 P.2d at 521. In determining the validity of a guilty plea, this court looks to the totality of the circumstances. *State v. Freese*, 116 Nev. 1097, 1105, 13 P.3d 442, 448 (2000). After sentencing, a motion to withdraw guilty plea may only be granted to correct manifest injustice. *See* NRS 176.165.

16

At the change of plea hearing, the district court canvassed King about the guilty plea agreement. When the district court went through the potential penalties, King got upset and told the district court he would not take "life without." The district court explained "the minimum range on first degree murder is 20 to 50, a definite term; a life – 20 on the bottom, a life with the possibility of parole; or 20 on the bottom, life without the possibility of parole." King continued to say he would not take a "life without." The district court then stated it could not go through with the plea canvass and King's attorneys requested time to discuss the plea with King. After 17 minutes, the parties came back and the district court started its canvass again. The district court again explained:

> The range of punishment on a murder, first degree murder, is 20 to 50 years, it's 20 to life with the possibility of parole, or it's 20 to life without the possibility of parole and no one can promise you any outcome. This is obviously a non-probationable offense on the murder. So the minimum you're looking at is 20 on the bottom and a potential life without.

At the evidentiary hearing, King testified his attorneys explained the potential consequences, including that he could receive life without the possibility of parole. He also testified he understood all of the potential penalties. He further testified his misunderstanding came from the district court's statement that "it's 20 to life without the possibility of parole." He also stated he believed that what the district court says is "golden."

The district court found King failed to demonstrate his counsel were deficient or prejudice resulting from a failure to explain or communicate with him regarding the consequences of his plea. Further, the district court found King failed to demonstrate his plea was not knowingly, voluntarily, or intelligently entered. We conclude the record supports the decision of the district court.

King's testimony demonstrated counsel informed him about the potential consequences of his plea and that he understood them. While the district court's wording of the potential life without the possibility of parole sentence was not clear, it does not change the fact King was correctly informed of the consequences by his attorneys, and in the guilty plea agreement, and he testified he understood them. Accordingly, King failed to demonstrate counsel was ineffective or that his plea was invalid.

(ECF No. 21-13 at 2–4.)

### 3.   De novo review

King-Hardiman argues that the Nevada Court of Appeals' finding that he

was correctly informed of the consequences of his plea by his attorneys was based on an unreasonable determination of the facts, so he argues that this court should review this ground de novo. (ECF No. 77 at 16.) As will be discussed further below, King-Hardiman's counsel failed to adequately advise him about being sentenced to life without the possibility of parole during his change of plea hearing, so this court finds that the Nevada Court of Appeals' finding that King-Hardiman was "correctly informed of the consequences [of his plea] by his attorneys" was based on an unreasonable determination of the facts. Further, for the reasons discussed in ground 1, the Nevada Court of Appeals' conclusion that the record supported the state court's finding that King-Hardiman's plea was knowingly, voluntarily, and intelligently entered involved an unreasonable application of *Boykin*. Finally, for the reasons discussed below, the Nevada Court of Appeals' conclusion that the record supported the state court's finding that King-Hardiman failed to demonstrate that his counsel was ineffective involved an unreasonable application of *Strickland*. For these reasons, ground 3 will also be reviewed de novo. *See Panetti*, 551 U.S. at 948.

### 4.   Analysis

At the post-conviction evidentiary hearing, King-Hardiman testified that he discussed the possible sentences he faced for a murder conviction, including the possibility of life imprisonment without the possibility of parole, with his trial counsel. (ECF No. 43-16 at 16, 20–21.) However, even if King-Hardiman's trial counsel adequately *informed* him of the standard possible sentences he faced, his trial counsel failed to reasonably *advise* King-Hardiman about the consequences of his plea at the change of plea hearing. Indeed, as was discussed in ground 1, King-Hardiman was adamant about not pleading guilty to anything that would expose him to a life without the possibility of parole sentence, the state court misstated the life without the possibility of parole sentence, King-Hardiman was rushed to plead guilty due to his capital jury trial getting ready to start, and King-

Hardiman ultimately exposed himself to the sentence that he resolutely rebuffed by pleading guilty. King-Hardiman's counsel failed to intervene and advocate for King-Hardiman under these circumstances: he did not correct the state court's inaccurate statements or attempt in any manner to bring attention to the confusing statements made by the state court, did not ask for a continuance— regardless of whether such a request would have been granted—to further discuss King-Hardiman's plea with him, and allowed King-Hardiman to plead guilty to the plea negotiations when he was clearly opposed to doing so. These omissions on the part of King-Hardiman's trial counsel were outside the range of professional competent assistance required under *Strickland*.

This court acknowledges that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *see also Richter*, 562 U.S. at 105 ("Even under *de novo* review, the standard for judging counsel's representation is a most deferential one."). Even though there is nothing in the record explaining the basis behind King-Hardiman's counsel's inaction during the change of plea hearing, King-Hardiman overcomes this strong presumption of adequate assistance, voiding any deference owed to King-Hardiman's counsel's actions. Indeed, there can be no reasonable professional judgment or strategic decision behind allowing a client to enter an unintelligent guilty plea.

Turning to prejudice, based on the record, there is more than "a reasonable probability that, but for counsel's errors, [King-Hardiman] would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Rather, the fact that King-Hardiman would have gone to trial absent his counsel's errors is a certainty. In fact, at the change of plea hearing, King-Hardiman stated that he only signed the plea agreement because he "was under the impression [he would] be facing 20 to 50 or 20 to life" and wanted to "take [his guilty] plea

back" when he learned that he was actually exposed to a life without the possibility of parole sentence under the agreement. (ECF No. 20-4 at 5–6.)

King-Hardiman is entitled to federal habeas for ground 3.

## IV.   CONCLUSION[9]

It is therefore ordered that the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 19) is granted as to grounds 1 and 3. Petitioner Andre King-Hardiman's judgment of conviction filed on July 31, 2014, in case number C244221, in the Eighth Judicial District Court for the State of Nevada is vacated. King-Hardiman's guilty plea is vacated, and the State may reinstate its notice of intent to seek the death penalty if desired. Within 180 days[10] of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, the state court must commence jury selection regarding the Clark County Grand Jury's July 16, 2008, Amended Superseding Indictment, accusing King-Hardiman of murder, invasion of the home, burglary, and robbery.

It is further ordered that the Clerk of the Court is directed to (1) substitute Nethanjah Breitenbach for Respondent Gittere, (2) enter judgment accordingly, (3) provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court for the State of Nevada in connection with that court's case number C244221, and (4) close this case.

DATED THIS 18th day of January 2024.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

[9]King-Hardiman requests that this court conduct an evidentiary hearing. (ECF No. 19 at 24.) This court declines to do so because it is able to decide the petition on the record.
[10]Reasonable requests for modification of this time may be made by either party.